UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------- X
EDMUNDO CALTENCO,                           :
                                            :
                        Plaintiff,          :
                                            :          **MEMORANDUM AND ORDER**
            -against-                       :
                                            :          16 Civ. 1705 (VMS)
G.H. FOOD INC. d/b/a NATURAL                :
GARDEN and GURDIP SINGH, an                 :
individual,                                 :
                                            :
                        Defendants.         :
----------------------------------------------------- X

**Vera M. Scanlon, United States Magistrate Judge:**

Plaintiff Edmundo Caltenco ("Plaintiff," often referred to by the parties and witnesses as "Mundo" or "Mr. Mundo") brings this action against Defendants G.H. Food Inc., doing business as Natural Garden, and Gurdip Singh Randhawa ("Mr. Singh") (referred to collectively as "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law ("NYLL"), N.Y. Lab. Law § 650 et seq., as amended by the Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195. See generally Complaint ("Compl."), ECF No. 1. The Court held a three-day bench trial, after which the parties made post-trial submissions. The Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(a). Having considered the evidence adduced at trial, the arguments of counsel, the Parties' post-trial submissions, and the controlling law on the issues presented, the Court concludes that Plaintiff is entitled to $7,749.79 in damages plus interest. Plaintiff's other claims are denied. Plaintiff's counsel may refile a fee application within 14 days of the date of this Order.

1

I.      **BACKGROUND**

A.      **Factual Background**

Plaintiff commenced this action seeking to recover, <u>inter alia</u>, unpaid overtime and minimum wages pursuant to the FLSA and NYLL, spread-of-hours premiums, liquidated damages, pre-judgment interest, post-judgment interest, statutory penalties for record-keeping violations, attorney's fees and costs.  Compl., ECF No. 1.

By his Complaint, Plaintiff alleged as follows:

Plaintiff was employed as a "general store worker" at Natural Garden from January 9, 2009 until December 29, 2015.  <u>Id.</u> ¶¶ 2, 12.  Plaintiff worked 12 hours per day, six days a week, for a total of 72 hours each week.  <u>Id.</u> ¶¶ 15.  "From in or about March 2010 through in or about June 2014, Defendants paid Plaintiff $530 per week for the first forty hours that he worked each week, amounting to an hourly rate of $13.25.  From in or about July 2014 to December 29, 2015, Defendants paid Plaintiff $630 per week for the first forty hours that he worked each week, which amounts to an hourly rate of $15.75."[1]  <u>Id.</u> ¶ 16.  Plaintiff was not paid at all for the hours worked each week in excess of 40 from March 2010 to December 29, 2015.  <u>Id.</u> ¶ 17.  Defendants never provided Plaintiff with the notices required by N.Y. Lab. Law § 195, specifically, proper paystubs under N.Y. Lab. Law § 195(3) ("Wage Statements").  <u>Id.</u> ¶¶ 22, 55, 57.  From January 1, 2014 through June 2014, and again from January 1, 2015 through December 29, 2015, Defendants failed to pay Plaintiff a spread-of-hours premium for shifts in excess of ten hours.  <u>Id.</u>, ¶¶ 20, 50, 52.

Defendants answered the Complaint, denying all of the substantive allegations of the Complaint.  <u>See</u> Answer ("Ans.") ECF No. 12.

---

[1] When questioned with these particular allegations at trial – read verbatim – Plaintiff responded, "That's completely false."  Tr. I 135:13-24.

The Parties completed discovery and consented to jurisdiction by this Court. See ECF

Nos. 48, 53. During the three-day bench trial, see ECF Nos. 65-70, Plaintiff testified on his own

behalf, but he did not offer additional witnesses. See Transcript of Day I of Bench Trial ("Tr.

I"), ECF No. 68; Transcript of Day II of Bench Trial ("Tr. II"), ECF No. 69. Defendants offered

testimony from defendant Mr. Singh, Defendants' accountant Rajan Moorjani ("Mr. Moorjani"),

Herpreet Randhawa (Mr. Singh's wife, "Mrs. Singh"), and Paul Arora ("Mr. Arora"), a former

manager at Natural Garden. See generally, Tr. II; Transcript of Day III of Bench Trial ("Tr.

III"), ECF No. 70.

Plaintiff offered a photograph of Mr. Singh sleeping in his car – which Plaintiff allegedly

took while driving Mr. Singh ("Pl. 3") – and contemporaneous records of Plaintiff's hours

worked and wages paid ("Pl. 7" bearing Bates Nos. D1-303), which were admitted into evidence.

ECF No. 65; Tr. I 50:13-51:19, 64:9-24. Defendants offered: copies of Plaintiff's pleadings

("Def. G"); a depiction of Plaintiff's signature ("Def. H"); an excerpt of the records similar to

those admitted as Pl. 7, but without Plaintiff's signature ("Def. I"); Plaintiff's telephone records

("Def. F"); Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories

("Def. E"); the Affidavit of Accountant Mr. Moorjani ("Pl. 8"); a payroll schedule for Plaintiff

("Def. B"); and a hand-drawn depiction of the layout of the Natural Garden store ("Def. J"), all

of which were admitted into evidence with the exception of Def. I and Pl. 8. See ECF Nos. 65-

67; Tr. I 80:21-82:9, 83:13-84:19, 85:10-86:23, 107:18-108:21, 121:3-17; Tr. II 54:20-55:25,

79:2-82:7, 93:7-94:11, 111:21-112:6; Tr. III 109:17-110:15.

Following the bench trial, and after several scheduling extensions, the Parties submitted

their proposed findings of fact and conclusions of law. See Plaintiff's Proposed Findings of Fact

("Pl. Supp. Br."), ECF No. 72; Defendants' Proposed Findings of Fact ("Defs. Supp. Br."), ECF No. 78.

## II.     DISCUSSION

Fed. R. Civ. P. 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58."  Fed. R. Civ. P. 52(a)(1).  Rule 52(a) further provides that such "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6).  Part of the role of the trial court in creating a finding of fact is determining how much weight to afford any given witness's testimony, and whether witnesses are credible.  See Krist v. Kolombos Rest., Inc., 688 F.3d 89, 95 (2d Cir. 2012) (in a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited"); Newman v. Herbst, No. 09 Civ. 4313 (TLM), 2011 U.S. Dist. LEXIS 15525, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to evaluate the credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the witness's explanation for any such inconsistent statements.").  If a plaintiff's testimony is found to be inconsistent with corresponding facts submitted to the court or is otherwise not credible, a court must resolve the inconsistencies in favor of the defendant.  See Diaz v. AJE Mgmt. Corp., No. 15 Civ. 1602 (AT) (JCF), 2017 U.S. Dist. LEXIS 4324, at *3 (Jan. 10, 2017), adopted by No. 15 Civ. 1602 (TPG) (JCF), 2017 U.S. Dist. LEXIS 25766 (S.D.N.Y. Feb. 23, 2017); Coulibaly v. Millennium Super Car Wash, Inc., No. 12 Civ. 04760 (CBA) (CLP), 2013 U.S. Dist. LEXIS 161860, at *7 (E.D.N.Y. Nov. 13, 2013).

## A. FINDINGS OF FACT

The following section constitutes the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial, the parties' trial exhibits, and the undisputed facts to which the parties stipulated. At the outset, the Court, in assessing the credibility of the witnesses, finds Defendant Mr. Singh, his wife Mrs. Singh, and non-party Paul Arora (referred to by the parties as "Mr. Paul," but hereinafter by the Court as "Mr. Arora") to generally to have been more credible than Plaintiff, as they were generally consistent with each other and with the day-to-day realities of small business operations. See, e.g., Chao v. Vidtape, Inc., 196 F. Supp. 2d 281, 290 (E.D.N.Y. 2002), aff'd as modified, 66 F. App'x 261 (2d Cir. May 23, 2003). Overall, Plaintiff appeared to exaggerate and overstate his roles, responsibilities, hours and tenure at Natural Garden. As discussed below, Plaintiff's testimony was sometimes implausible, contradicted by more credible evidence or testimony from other witnesses, and/or inconsistent with his own prior statements. For example, he was impeached at least a dozen times on material issues. See, e.g., Tr. I 70:25-73:1, 77:14-79:10, 88:2-24, 91:4-21, 131:11-133:20, 134:2-18.

In contrast, non-party Mr. Arora was particularly credible. He testified that he worked for Defendants from 2010 through April 2014. Tr. III 73:10-14. He left Natural Garden to go to India, where he remained until January 2018 when he returned to the United States but moved to California where his son lives. Tr. III 73:15-25. At the time of trial, he had only been in New York for a few weeks. Tr. III 74:1-3. The Court found Mr. Arora to be forthright and unbiased in favor of or against either side, testifying that Plaintiff was "[r]eally good" at his job and "very nice," and that they had a very good relationship. Tr. III 77:3-5, 20-21. He described Mr. Singh

as being "a really nice man." Tr. III 78:9-11. Based on these considerations and his overall demeanor, the Court found Mr. Arora's testimony persuasive.

## 1. Stipulated Facts

The parties have stipulated that: (1) Natural Garden was Plaintiff's employer under the FLSA and NYLL (Proposed Joint Pretrial Order ("JPTO") p. 6, ECF No. 52); (2) for purposes of the FLSA, Natural Garden satisfies the minimum income requirements (i.e., the "annual gross volume of sales made or business done") for enterprise coverage at all times relevant to this litigation (id.); (3) for purposes of the FLSA, Natural Garden was engaged in interstate commerce (id.); (4) for each week that Plaintiff worked, Defendants paid him his wages in cash only (id.); and (5) Mr. Singh was Plaintiff's employer under the FLSA and NYLL (Tr. III 112:2-10, ECF No. 70).

## 2. Plaintiff's Duties and Responsibilities

The Court finds that Plaintiff worked as a stockperson, in which his duties were primarily to assist with unloading deliveries, stock and price products, and clean the store. See, e.g., Tr. II 7:4-25. In addition to the duties credited by the Court, Plaintiff claimed to have: (1) worked in the deli; (2) fielded calls to and from vendors and salespersons for deliveries three times a day (Tr. II 32:2-33:22); (3) assisted in the Singhs' clothing store next door to Natural Garden two to three times per week by receiving merchandise to bring to the basement, cleaning, working as security, as well as placing tables and clothing (Tr. I 55:1-18); (4) set up and take down furniture and fixtures in the "party room" above Natural Garden (Tr. I 53:20-54:23); (5) driven Mr. Singh to New Jersey to do landscaping work 4-5 times each summer (Tr. I 50:4-8, 51:21-22); and (6) parked and retrieved the Singhs' cars for them. Tr. I 52:13-15. As discussed, infra, the Court does not credit Plaintiff's account of these additional responsibilities.

Rather, when initially asked about a "typical day," Plaintiff responded:

> Any given day I would arrive at 8:00 in the morning to work, waiting for Mr. Paul to arrive to open the gate and then I would bring down the wood plank for the ramp and I would receive continuously the deliveries, bread, fruits and vegetables. And then we would put the merchandise on the shelf. It was a daily routine.

Tr. I 45:3-10. When asked if there were any other things he would do in the store routinely, Plaintiff responded that he would clean, sweep and mop the floor on a daily basis. Tr. I 49:2-6.

Plaintiff provided a substantially similar description of his daily routine and duties when questioned by the Court on the second day of trial:

> Like I said, I would receive the materials, the products in the morning, and then I fixed flowers.[2] I would place groceries again. I would have to be cleaning, checking the products, and when they were finished we would put some more again. And that was in general. There was an infinite amount of products which we had to be refilling. It was a daily routine. . . . We swept the store, we mopped, we cleaned the yogurt refrigerators, we cleaned the glass on the refrigerators. We would go down to the basement and fix the extra things like beers and store products. We would also clean the fridge downstairs. We would clean the stairs and that was a daily routine.

Tr. II 7:4-25. This account of the scope of Plaintiff's duties was corroborated by Mr. Arora: "His job duties was whenever I used to receive the boxes, I would write on top of it and he would write price on top of it and put it in the shelf. And if there was any other help that's necessary, he would help. And in the evening, if there was something like garbage to pack and he would take care of that, as well. . . . He would also take care of like if there was any expired product on the shelf, he would also take care of it and – yeah." Tr. III 77:6-19; accord Mrs. Singh's testimony at Tr. III 45:4-13. Mr. Singh similarly testified that Plaintiff would stock merchandise

---

[2] Plaintiff and Mr. Singh testified that when Plaintiff began at Natural Garden, he was initially hired in part to arrange ("fix") flowers, although this work was short-lived as Natural Garden discontinued its floral sales. See Tr. I 35:22-23, 89:24-90:3; Tr. II 220:8-222:2.

based on instructions from Mr. Arora, tie up leftover boxes, clean up in the store, and if he had extra time, check for expired merchandise. Tr. III 139:18-140:24.

Absent from these descriptions of Plaintiff's duties – most notably, Plaintiff's own testimony – was any mention of him working at a deli counter, fielding calls to or from vendors, assisting in the clothing store, working upstairs in the "party room," and/or moving the Singhs' cars. As discussed below, each of these "additional" responsibilities claimed by Plaintiff was problematic and suspect on its own. If accepted in their totality as part of a daily or weekly routine, they would have left an implausibly limited amount of time remaining for Plaintiff's stocking and cleaning duties at the store, even if Plaintiff had been working 72 hours per week (which the Court, as below, finds he was not).

On the first day of trial, when asked on direct if he ever worked in the deli at the store, Plaintiff responded "[y]es, many times" and indicated that he "[t]ended to the clients" and "ma[de] sandwiches." Tr. I 37:16-21. When the Court inquired about Plaintiff's role in the deli, he conceded that Mr. Arora normally worked in the deli, but that Plaintiff would sometimes help. Tr. II 6:20-22. When the Court followed up and asked how often he had worked at the deli, Plaintiff further narrowed his account of his efforts, explaining that "there were very few clients, so I didn't help too much at the deli. That's the reason why they got rid of the deli." Id., 6:23-25. On the third day of trial, Mr. Arora testified that as far as he knew, Plaintiff did not have anything to do with the deli. Tr. III 103:20-25; see also Mr. Arora's further testimony at Tr. III 104:1-6 (Q. "You don't remember Mundo working in the deli?" A. "Mundo, Mr. Mundo's, responsibility was to write prices on the product and put it on the shelf and take care of whatever was necessary in the back of the store and to – to take care of the delivery of the drinks or

8

whatever would come in.  Mr. Mundo never have worked in the deli.")  The Court declined to credit Plaintiff's testimony with regards to a role at the deli counter.

Plaintiff also testified that as a stockperson, he would call (and receive calls from) vendors regarding deliveries two to three times per day, for three to four minutes per call.  Tr. II 32:12-34:1.  He claimed that "vendors would ask [him] what products [he] needed" and that he would speak with them to correct mistakes in orders.  Tr. II 32:8-19.  Although Mr. Singh acknowledged that Plaintiff spoke to vendors at the beginning of his employment to order flowers, as he was the only employee who knew about flowers, Mr. Singh testified that making calls to vendors generally was not one of Plaintiff's responsibilities.  Tr. II 141:12-142:1.  When asked if Plaintiff had responsibilities to call vendors or delivery people if there was an issue with an order, Mr. Arora responded unequivocally: "no."  Tr. III 79:2-4.  The Court concludes that Plaintiff was  exaggerating this role at the store.

Plaintiff also claimed he worked at the Singhs' clothing store next to Natural Garden two to three times per week under their direction to "receive merchandise, shoes, clothing, [] bring them down to the basement" and/or "clean the place, place tables, clothing," and that other times, he worked as security for the clothing store.  Tr. I 55:8-56:8.  Earlier in Plaintiff's testimony, however, when discussing the basement office at the clothing store (apparently the only office between the two stores), Plaintiff testified that he would take receipts for grocery products to Mr. Singh to revise or sign, but that he would not go to the office for any other reason.  Tr. I 39:1-9.  The Court finds it incredible that Plaintiff could have worked for the clothing store several times per week as he claimed without regularly (or even irregularly) visiting the basement office therein and without having including such visits in his list of regular duties.  Further, Mrs. Singh testified that Plaintiff did not work at the clothing store and that she had two women who worked

there, although she conceded that she did ask Plaintiff to come by her store once when she felt unsafe. Tr. III 53:3-6, 55:17-18, 61:17-22. The Court therefore declined to credit Plaintiff's claim that he worked at the clothing store except on a very rare occasion.

The Singhs' own (or owned) a "party hall" on the floor above Natural Garden. Tr. I 38:6-7. According to Plaintiff, parties were held there approximately three times per month, mostly on Saturdays, and it was part of his job on Saturdays to "clean the room, check the tables, the tablecloths, the chairs, put ice at the bar, put garbage bags on the garbage cans, clean the mirrors on the walls, [and] clean the bathrooms." Tr. I 53:20-54:5; Tr. II 9:8-9. He also testified that on Monday around 10:00 AM, he and the other stockperson would clean up after the parties for approximately three hours by vacuuming the carpet, cleaning the mirrors, mopping the bar area floor, placing the tablecloths, and placing the chairs. Tr. I 54:11-21; Tr. II 9:17-23.

Plaintiff initially failed to include this upstairs work in his description of his responsibilities. Based on Plaintiff's description, it is difficult to credit Plaintiff's assertion that both stockpersons for a small grocery store would be unavailable to assist with deliveries for a three-hour period on most Monday mornings – the same day beverages, including 150 to 200 boxes of beer, were delivered each week. See Plaintiff's testimony at Tr. I 48:2-14. For his part, Mr. Singh denied that Plaintiff had any responsibilities for the party room, and he confirmed that parties were only held on Saturdays. Tr. II 144:6-17. He described that customers who rented the space were responsible for everything, and that two other people who the Singhs knew from the neighborhood would work as serving staff and cleaners for the parties. Id., 144:12-25. Mrs. Singh corroborated that Plaintiff had not worked in the event room, and she testified credibly under cross-examination that the Singhs would recommend two women from the area as staff when people booked the room, but that they were not the Singhs' employees. Tr. II 58:22-60:20.

Mr. Arora testified that he did not have any responsibilities for the event hall upstairs, and that he did not believe Plaintiff did either. Tr. III 79:5-22. The Court finds that the day manager, Mr. Arora was a credible witness as to whether his stockpersons were gone from the store for three hours on most Mondays (which they were not). The Court therefore concludes that Plaintiff did not have any significant or regular role with regards to the event space.

In addition to the other duties and obligations Plaintiff claimed he had, he testified that he went to New Jersey with Mr. Singh to "cut his grass at his house" and would regularly park Mr. and Mrs. Singhs' cars for them. Tr. I 50:1-8. He claimed that he went to New Jersey with Mr. Singh "four to five times during summertime" on work days, during each of his five years of employment (for an approximate total of 16-20 times) and that it took almost three hours to get there or back, although the trip was longer with traffic. Tr. I 51:21-52:7, 90:5-25. Plaintiff was impeached by Defense counsel during cross-examination on this topic, as he had previously testified at his deposition that he had gone to New Jersey "about eight times." Tr. I 91:4-21.

Mr. Singh confirmed that he and Plaintiff had gone to New Jersey twice. Tr. II 145:1-146:24. Mr. Singh explained credibly that he had hired a student to cut the grass of the property, that the student had gone on vacation without alerting the Singhs, and that the township had asked them to cut the grass. Tr. II 147:2-16. Mr. Singh testified that this was the first time he had gone with Plaintiff to New Jersey, and that he had asked Plaintiff to drive because he (Mr. Singh) was not feeling well, that they went during Plaintiff's work hours, but that they did not actually cut the grass that day. Id. Plaintiff and Mr. Singh went to the property a second time, approximately a year later, and that time they did cut the grass after the caretaker had not done so. Tr. II 148:13-24. The Court found Mr. Singh's account of these trips and their frequency

more credible than Plaintiff's, and that these trips occurred during Plaintiff's regular work hours for which he was compensated in his weekly salary.

Plaintiff claimed he parked Mrs. Singh's car four to five times per week around 9:30 or 10:00 AM in the morning, and she would pick it up at 7:00 PM at night. Tr. I 52:13-24. Plaintiff testified unclearly as to how frequently he parked Mr. Singh's car. See id. Again, these duties were inconsistent with Plaintiff's morning stock duties as he and Mr. Arora testified about them. See Tr. I 45:3-10; Tr. II 7:4-25; Tr. III 74:11-13, 77:6-12. Further, Mrs. Singh testified that she did not close the Singhs' clothing store next door until 7:30 PM most nights, and that at that point, she would generally work at Natural Garden for variable amounts of time depending on the needs of the day. Tr. III 40:1-15; see Mr. Singh's testimony at Tr. II 191:2-10 ("[Mrs. Singh] finished [at] 7:30. The – the cash register close, take a half an hour to wrap it up everything.") Thus, when Mrs. Singh arrived at Natural Garden, Plaintiff had generally already left – although on Tuesdays he stayed until 8:00 PM, so sometimes she would see him. Tr. III 46:14-47:5. She also directly denied that she had asked Plaintiff to move or park her car. Tr. III:49:21-50:1; 55:1-6. The Court finds that Mrs. Singh's testimony as credible regarding her work hours and routine in running the two small businesses, and discredits Plaintiff's claim that he retrieved her car for four to five times per week at or around 7:00 PM.

As detailed above, the Court finds that Plaintiff exaggerated his roles and responsibilities during his employment. This may have been done for the purposes of, inter alia, making his claim of working 12 hours every day more credible and thus enhancing his potential recovery. This exaggeration diminished Plaintiff's credibility as to the roles and responsibilities he claimed to have had, especially because his claimed hours and duties did not match the business realities of Natural Garden, and were only supported by his own self-serving testimony. Although he

may have engaged in these "additional" roles or duties once or twice each, they were not part of his regular duties or the typical scope of his employment.[3]

### 3. Defendants' Records of Plaintiff's Hours and Wages

The Court finds that Defendants maintained accurate records of Plaintiff's hours worked and wages paid. All the witnesses testified that Natural Garden's managers tracked employees' hours by generally writing down each employee's arrival time and departure time on a daily basis. See Plaintiff's testimony at Tr. I 60:1-21, 62:14-23; Mr. Singh's testimony at Tr. II 125:8-131:13; Mrs. Singh's testimony at Tr. III 40:16-41:7; Mr. Arora's testimony at Tr. III 83:11-85:9. At the end of each week, the manager provided the weekly timesheet to Mr. Singh, who then reviewed the information and entered the names, hours and days into a composition notebook in order to calculate the employees' pay. Tr. II 150:14-151; Tr. III 41:8-42:3, 85:10-87:14. Each employee signed the notebook confirming their hours worked and compensation received at the end of each week. Tr. I, 143:2-24; Tr. III 41:8-42:3, 83:11-89:12. Relevant excerpts of these contemporaneous wage records were admitted into evidence as "Plaintiff's Exhibit 7" ("Pl. 7") without objection from either party. Tr. I 64:9-24; see also Tr. III 42:4-43:9 (Mrs. Singh confirming Pl. 7).

Although Plaintiff contended that the document he signed did not contain his schedule or total hours and that the 303 pages of wage records admitted into evidence were falsified, the Court does not credit this opinion. Tr. I 66:1-23. In numerous places in the records, Plaintiff's

---

[3] Several of these "additional" roles and responsibilities (e.g., deli work, "party" room work) may have been part of an attempt by Plaintiff to qualify for the potentially more favorable Hospitality Wage Order under NYLL 146, et seq. See Compl. ¶ 34. To the extent Plaintiff intended to assert claims under the Hospitality Wage Order, these claims appear to have been abandoned. See Pl. Supp. Br., generally (in which the only citation to the Hospitality Wage Order related to spread-of-hours provisions as part of a string cite). The Court found no factual basis for applying the Hospitality Wage Order.

darker signature overlaps with the lighter total number of hours and/or scheduled hours on the page without any apparent distortion as to either marking. See, e.g., Pl. 7 D51, 52, 69, 81, 166. The Court finds that Plaintiff signed the documents after and sometimes on top of the hourly notations that had already been recorded. Id. In general, the Court attributes significant weight to these records as being the best evidence of Plaintiff's hours worked, of wages paid, and of the terms of his employment agreement with Defendants. By contesting this regular record-keeping business practice in which he participated, Plaintiff further undermined his own credibility.

The Court further finds – and it is undisputed – that Defendants did not provide Plaintiff with any written statements regarding his wages. Tr. I 62:14-64:8; Tr. II 225:2-17.

### 4. Plaintiff's Start and End Dates

The Court finds that Plaintiff began working for Defendants on February 8, 2010. See Pl. 7, at D1. Although Plaintiff testified at trial that he began working for Defendants on February 2007 or 2008 (and at his deposition, 2009),[4] neither the contemporaneous wage records nor other evidence introduced at trial supports that contention. Compare Plaintiff's testimony at Tr. I: 33:17-23; 78:13-79:10; with Mr. Singh's testimony at Tr. II 131:17-18, 132:24-25, 200:8-13; Mrs. Singh's testimony at Tr. III. 45:1-2; Pl. 7 at D1. Rather, in contrast to Plaintiff's uncertainty as to when he started at Natural Garden, Mr. Singh was unequivocal on both direct and cross examination that it was February 2010. Tr. II 131:17-18, 132:24-25, 200:8-13. Plaintiff's own testimony further undermines his claims on this issue. He testified that Mr. Arora was already working at Natural Garden when he began his employment (Tr. I 46:4-6); however, Mr. Arora testified he only began at Natural Garden in 2010. Tr. III 73:5-12. Both Mrs. Singh

---

[4] Plaintiff conceded that his recollection is, understandably, not necessarily perfect given the length of time since these events occurred. Tr. I 79:18-80:7.

(Tr. III 45:1-2) and the contemporaneous wage records provided additional corroboration that Plaintiff began working at Natural Garden in February 2010, with the wage records specifically indicating that Plaintiff's first day of work was February 8, 2010. Pl. 7 at D1. The Court finds that the Parties do not dispute that Plaintiff's employment ended on December 29, 2015. Tr. I 44:2-4.

### 5. Plaintiff's Scheduled Hours

The Court finds that Plaintiff generally worked a regular schedule of 8:00 AM to 6:00 PM on Monday, Wednesday, Thursday, and Friday, 8:00 AM to 8:00 PM on Tuesdays, and 9:00 AM to 7:00 PM on either Saturday or Sunday. Tr. II 134:2-23; Pl. 7, generally. Although Plaintiff contends that his general schedule was actually 8:00 AM to 8:00 PM on weekdays and 9:00 AM to 9:00 PM on either Saturday or Sunday, for a total of 72 hours per week, the Court does not find this contention credible as it was contradicted by the testimony of other witnesses and documents admitted.

Mr. Singh credibly testified that Plaintiff was hired to work six days a week, at the schedule described above, generally ten hours per day, but slightly longer (12 hours) on Tuesdays because that was the day when the majority of the deliveries arrived. Tr. II 134:2-23. Mrs. Singh corroborated this schedule and testified further that when she arrived at Natural Garden at 7:30 PM (after the Singhs' clothing store next door closed), Plaintiff would generally be gone. Tr. III 45:14-46:25. The contemporaneous wage records also depicted Plaintiff's regular schedule as described above. Pl. 7, generally. Notably, non-party Mr. Arora – who had no apparent interest in this matter as he has not worked for Defendants since 2014 and no longer lived in New York – testified that he generally worked similar hours to Plaintiff, 8:00 AM to 6:00 PM Monday through Friday, and 9:00 AM to 6:00 PM on Saturdays. Tr. III 74:18-75:1,

76:1-7.  He was familiar with Plaintiff's scheduled hours and further corroborated Plaintiff's schedule as found by the Court.  Tr. III 80:5-81:10.

### 6. Plaintiff's Pay

The Court finds that the Plaintiff was paid a weekly salary – and received increases to same – which he and Mr. Singh agreed covered the 62 hours he generally worked, with the first forty hours at a regular rate at or above minimum wage, and the overtime hours (usually – as discussed further below) paid at a premium rate one and one half times his regular hourly rate – which generally closely tracked the New York minimum wage.  This weekly schedule and pay arrangement was established when Plaintiff was hired.  Although the parties disagree about some aspects of their initial conversation, the Court credits Mr. Singh's recounting as more credible and consistent with the records and business practices than Plaintiff's version.  Plaintiff was impeached numerous times on his inconsistent testimony with regards to his understanding of English (testifying at his deposition that his understanding was an "8/10" but testifying at trial that it was "5/10"), when he learned about overtime (before or after beginning his employment with Defendants), whether he ever discussed overtime with Mr. Singh, and how many pay raises he received (two or three).  Tr. I 70:25-73:1, 88:2-24, 131:11-133:20, 134:2-18.  In general, Plaintiff appeared to testify so as to present as sympathetically, and in as unsophisticated a way as possible, as to the wage negotiations.

The Court finds that on or about February 8, 2010, Plaintiff approached Mr. Singh to inquire about a job.  Tr. I 35:16-22; Tr. II 132:24-25.  At the time he approached Mr. Singh, Plaintiff had previously worked for a small store and was familiar with overtime pay.  Tr. I 131:11-132:6.  The parties engaged in arms-length negotiations, discussed that Plaintiff would work six days for a total of 62 hours a week, and that his schedule would be as described above.

16

Tr. II 134:2-23. Mr. Singh asked Plaintiff what he was making at the other store, to which Plaintiff replied $530 per week. Tr. I 134: 20-24; Tr. II 135:15-22. Mr. Singh responded, in sum and substance, that he paid his employees only minimum wage, which was $7.25 an hour at that time. Tr. II 135:22-25. The parties further negotiated this hourly rate, and Mr. Singh offered Plaintiff an extra $0.25 per hour due to Plaintiff's prior experience working in a similar store and knowledge of flower arranging. Id. 138:12-16, 220:8-222:2. Plaintiff asked what the weekly rate would be, and after a call to his accountant, Mr. Singh informed Plaintiff that his weekly gross would be $547.50 (($7.50 * 40 = $300.00) + ($11.25 *22 = $247.50)). Id. 136:5-21, 137:22-138:2. At Plaintiff's urging, Mr. Singh agreed to round the number up to $550. Id. Plaintiff and Mr. Singh thus agreed that his weekly salary would be $550 including overtime based on the 62-hour schedule discussed. Id. 138:1-6; see also Tr. I 37:1-2 ("Q: Okay. And how did you know when to start working? A. Because of the agreement that he and I made. . . . Not written, just verbal."). The contemporaneous wage records, signed by Plaintiff, which set out Plaintiff's schedule, total hours, and compensation further support the existence of this agreement between the parties. See generally, Pl. 7. This Court finds this agreement included an overtime premium.

Plaintiff's hourly rate began as $7.50 for his regular hours, and $11.25 for his overtime hours, rounded up to $550. Tr. III 188:1-5. This was Plaintiff's weekly salary until August 22, 2011, when he requested and received an increase to $575, and it was again increased to $600 around September 10, 2012. Tr. I 68:4-20; Pl. 7, generally. As noted above, when Plaintiff began his employment with Defendants, the minimum wage was $7.25 an hour. Tr. II 135:22-25; Gamero v. Koodo Sushi Corp., 272 F. Supp. 3d 481, 499 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d. Cir. 2018). Thus, at that time, Plaintiff's weekly salary would have to (and did)

meet or exceed $529.25 (($7.25 * 40 = $290.00) + ($10.875 * 22 = $192.50)) to meet the minimum wage and overtime requirements for his usual 62-hour week. Pl. 7 at D1-202. Similarly, when the minimum wage was increased to $8.00 an hour on December 31, 2013 (Gamero, 272 F. Supp. 3d at 499 (S.D.N.Y. 2017)), Plaintiff's weekly salary needed to (and did) meet or exceed $584.00 (($8.00 * 40 = $320.00) + ($12.00 * 22 = $264.00) for his usual 62-hour work week. Pl. 7 at D203-250. Notably, Plaintiff testified that he himself requested each of his raises with Mr. Singh at a weekly rate, which the Court finds was in furtherance of their prior agreement regarding his hours, schedule, wages and overtime. See Tr. I 67:23-68:3 (Q. "Okay. How did you come to receive those increases?" A. "Because I would ask [Mr. Singh]."); id., 68:9-22 (Plaintiff asked for and received the first and second raises of $25, per week); id., 68:23-69:6 (Q. "Okay. How much was [the third raise] for?" A. "I asked him $50 but he just gave me 30." Q. "Okay. Did you ask for $50 per week?" A. "Yes. As a raise, yes." Q. "Okay. And Mr. Singh gave you a raise but gave you a $30 one?" A. "That's correct.").

The minimum wage increased to $8.75 per hour on December 31, 2014 (Gamero, 272 F. Supp. 3d at 499), and therefore, Plaintiff's weekly salary was required to – but did not – increase to at least $638.75 per week (($8.75*40 = $350.00) + ($13.125 * 22 = $288.75)) in order to compensate him at for his usual schedule and overtime premium in 2015. Pl. 7 at D251-266. Accordingly, he was underpaid for his typical 62-hour schedule by $38.75 per week. Plaintiff did not receive another raise until April 20, 2015, when his weekly salary was increased to $630 – thus $8.75 less per week than his required minimum-wage compensation. Pl. 7 at D267-303.

Although Mr. Singh testified that Plaintiff's compensable hours were reduced from 62 to 58 in January 2015 due to Plaintiff's allegedly long lunch breaks – which would have brought his minimum required compensation to $586.25 (($8.75*40 = $350) + ($13.125 * 18 = $236.25)) –

the contemporaneous wage records do not show this reduction. Compare Tr. II: 156:21-158:6, 159:11-160:23, with Pl. 7 at D251-266. Moreover, from February 2010 until January 2015, Plaintiff's compensation for the 62 hours worked had included these lunch breaks – they had never been deducted or otherwise accounted for in his wages. Pl. 7 at D1-250; Tr. II 159:21-24. Based on the course of the parties' conduct, testimony and the documentary evidence, the Court finds that Plaintiff's breaks were part of his usual 62-hour schedule. Pl 7, generally; Tr. II 159:21-24. For the same reasons, the Court declines to credit Mr. Singh's assertion that Plaintiff's compensable hours were raised from 58 to 60 in April 2015 – thus bringing Plaintiff's minimum required compensation from $586.25 to $612.50 (($8.75*40 = $350) + ($13.125 * 20 = $262.5)). Compare Tr. II 161:1-13, with Pl. 7 at D267-303.[5] Rather, the Court finds that Plaintiff's usual weekly salary was intended to compensate him for his usual 62-hour schedule throughout his employment with Defendants. Tr. II 159:21-24; see also, e.g., Pl. 7, generally. Thus as shown in the chart below, Plaintiff's salaries for 2015 were below the required minimum wage even after his wages were increased to $630 per week.

| Time Period | Hourly Min. Wage ("Reg") | Overtime Rates for Min. Wage ("OT") | Min. Wage for 62 Hrs (40 Reg + 22 OT) | Plaintiff's Weekly Salary |
|---|---|---|---|---|
| 2/8/10 - 8/22/11 | $7.25 | $10.875 | $529.25 | $550.00 |
| 8/23/11 - 9/10/12 | $7.25 | $10.875 | $529.25 | $575.00 |
| 9/11/12 - 12/31/13 | $7.25 | $10.875 | $529.25 | $600.00 |
| 1/1/14 - 12/31/14 | $8.00 | $12.00 | $584.00 | $600.00 |
| 1/1/15 - 4/20/15 | $8.75 | $13.125 | $638.75 | $600.00 |
| 4/21/15 - 12/19/15 | $8.75 | $13.125 | $638.75 | $630.00 |

---

[5] Notably, there are weeks around April 2015 when the contemporaneous wage records do indeed reflect that Plaintiff worked 60 hours per week, but this seems to have been based on his actual hours worked, rather than any claimed deduction of lunch breaks. See Pl. 7 at D267-29, 271-276. The Court therefore credits the total hours recorded therein.

**B. CONCLUSIONS OF LAW**

**1. Jurisdiction**

This Court has subject matter jurisdiction of this action with respect to the claims made by the plaintiff under the FLSA pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337. The claims arising under New York law are so related to the claims under the FLSA that they form part of the same case or controversy, and thus, they fall under the supplemental jurisdiction of the Court as defined in 28 U.S.C. § 1367(a).

**2. Defendants' Joint and Several Liability Under The FLSA And The NYLL**

The parties stipulated that Defendant Mr. Singh was Plaintiff's employer under the FLSA and NYLL. Tr. III 112:2-10, ECF No. 70. The parties also stipulated that Plaintiff was an employee of Natural Garden. JPTO p. 6, ECF No. 52. Where both an individual and a business are considered employers under the FLSA and/or NYLL, they are jointly and severally liable for any judgment resulting from a plaintiff's claims under those statutes. Inclan, 95 F. Supp. 3d at 511. Here, because both Natural Garden and Mr. Singh are considered Plaintiff's employers within the meaning of the NYLL and FLSA, they are jointly and severally liable from any judgment resulting from Plaintiff's claims in this action. See id.

**3. The Relevant Limitations Periods Under The FLSA And The NYLL**

"The FLSA provides a two-year statute of limitations on actions to enforce its provisions, 'except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.'" Parada v. Banco Indus. de Venez., 753 F.3d 62, 70 (2d Cir. 2014) (quoting 29 U.S.C. § 255(a), which states the applicable statute of limitations for claims relating to "unpaid minimum wages, unpaid overtime compensation, or liquidated damages"). "[T]o prove a willful violation of the FLSA within the meaning of § 255(a), it must

20

be established that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Reich v. Waldbaum, Inc., 52 F.3d 35, 39 (2d Cir. 1995) (quotation marks omitted). "[I]f an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful." Id. (quotation marks and alterations omitted). The NYLL establishes a six-year limitations period for NYLL violations. See N.Y. Lab. Law §§ 198(3), 663(3); Nakahata v. N.Y.-Presbyterian Healthcare Sys., 723 F.3d 192, 198 n.4 (2d Cir. 2013). Therefore, Plaintiff may recover under the NYLL for claims arising outside of the FLSA's three-year limitations period but within the NYLL's six-year limitations period.

Plaintiff filed his Complaint on April 7, 2016. See Compl. Plaintiff may recover damages arising out of his employment going back six years under state law, from April 7, 2010, and three years under federal law, from April 7, 2013. The Court finds that Plaintiff began his employment on February 10, 2010, he may recover under the NYLL for the vast majority, but not the entirety, of his employment, and for part of his employment under federal law. "As the NYLL's six-year statute of limitations period overlaps the entire FLSA statutory period, Plaintiff does not seek to prove that Defendants' conduct in violation the FLSA was willful so as to extend the FLSA's statute of limitations from two years to three, which would be an entirely academic exercise." Pl. Supp. Br., p. 19 n.4. The Court agrees.

### 4. Unpaid Wages

The FLSA and NYLL require that an employee be paid a minimum wage. See 29 U.S.C. § 206; N.Y. Lab. Law § 652. The relevant New York minimum-wage rate for employees not eligible to be paid at the tipped minimum-wage rate was $8.75 per hour from December 31, 2014, through the end of Plaintiff's employment in December 2015. See Gamero, 272 F. Supp. 3d at 499. In addition, both federal and New York state law require employers to pay for hours

worked in excess of 40 hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1); N.Y.C.C.R.R. § 142-2.2 (incorporating the FLSA definition of overtime into the NYLL).

Although "[f]or purposes of FLSA, '[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours.'" Moon v. Kwon, 248 F. Supp. 2d 201, 207 (S.D.N.Y. 2002) (quoting Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999)); see Ibarra v. HSCS Corp., No. 10 Civ. 5109 (KBF), 2012 U.S. Dist. LEXIS 130118, 2012 WL 3964735, at *2 (S.D.N.Y. Sept. 10, 2012) ("[E]mployers and employees may expressly agree to a weekly salary that includes a regular rate as well as an overtime premium.") "In the absence of any written instrument memorializing the parties' intentions, the Court must infer the terms of their agreement from the entire course of their conduct, based on the testimonial and documentary evidence in the record." Moon, 248 F. Supp. 2d at 206.

Here, and as discussed further above, Plaintiff knew of overtime when he approached Mr. Singh, knew and agreed to his daily schedule and the hours he would work each week, negotiated his rate of compensation for those hours and was told by Mr. Singh after he consulted his accountant that the total compensation was based on the minimum wage rate. See II(A)(5)-(6), supra. The Court finds the so-called Giles presumption rebutted here, based on the credible testimonial and documentary evidence before the Court, and in particular, the contemporaneous wage records signed by Plaintiff, and finds that both parties intended and understood that this weekly salary was compensation for the 62-hour schedule and included overtime hours compensated at a premium rate. See II(A)(5)-(6).

Plaintiff points out that for the handful of weeks during his five-year employment in which he worked more than half a day less than his usual schedule, he was paid by the day or half-day, i.e., paid a proportion of his weekly salary, instead of his salary being reduced only as to his unworked hours. Pl. Supp. Br., pp. 7-8 ¶¶ 20-22. Plaintiff argues that this lack of precision in reducing his pay for unworked hours undermines the finding that his salary covered both hours worked at a regular rate as well as hours worked beyond 40 per week at an overtime premium. Id. The Court rejects this argument. It bears noting that in nine of the eleven instances in which this adjustment occurred during the first four years of Plaintiff's employment, he was paid either the same amount or more than he would have earned under a strict hourly reduction. See Pl. 7 at D17, 25, 30, 73, 129, 191, 202, 204, 208, 216, 220. Thus, this reduction cannot be said to undermine Plaintiff's agreed-upon, lawful salary arrangement. Although Plaintiff should be (and shall be, as described below) compensated for the two instances (the weeks of 8/8/2010 and 4/20/2014) in which these shorthand calculations were not in his favor, the Court declines to artificially inflate Plaintiff's regular pay rates by applying a counter-factual presumption that Plaintiff's salary only covered 40 hours. See Pl. 7 at D25, 216.

As described above, in the last year of Plaintiff's employment, his total compensation did not meet the minimum required wages for 40 hours of regular time and 22 hours of overtime. He is therefore entitled to the difference as compensatory damages.

### 5.    Defendants Are Liable For Failing To Pay Plaintiff Spread-Of-Hours Premiums in 2015 As Required By The NYLL

The NYLL entitles certain employees to an additional hour of pay at the minimum wage for each day that the employee works over an interval exceeding ten hours. See 12 N.Y.C.R.R. tit. 12, § 142-2.4. The "spread of hours" refers to the length of the interval between the beginning and end of the employee's workday. Id. Minimum wage employees are generally

23

entitled to the spread-of-hours payments at the regular minimum wage for each day they work more than ten hours.  Id.  As discussed above, Plaintiff's weekly salary was above the minimum wage except in 2015.  Plaintiff is entitled to, and Defendants are liable for, spread of hours pay for each of Plaintiff's shifts over 10 hours in 2015.

### 6. Defendants Are Liable For Failing To Provide Plaintiff With Wage Statements Under The WTPA

Plaintiff seeks to recover statutory damages under the WTPA for Defendants' failure to provide accurate wage statements.  Compl. ¶¶ 54-59.  The WTPA requires employers to provide employees with a "wage statement" with each payment of wages.  N.Y. Lab. Law § 195(3). Each wage statement must include the following information:

> the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages. . . . [T]he statement shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

N.Y. Lab. Law § 195(3).  Notably, "it shall be an affirmative defense that (i) the employer made complete and timely payment of all wages due pursuant to this article or articles nineteen or nineteen-A of this chapter to the employee who was not provided statements . . . ."  N.Y. Lab. Law § 198(1-d).

Prior to February 27, 2015, the WTPA entitled employees to recover wage statement damages of $100 per workweek, not to exceed $2,500.  See 2010 N.Y. Laws ch. 564 § 7, amending N.Y. Lab. Law § 198(1-d); see Baltierra v. Advantage Pest Control Co., No. 14 Civ. 5917 (AJP), 2015 WL 5474093, at *10 (S.D.N.Y. Sept. 18, 2015).  As of February 27, 2015,

employees are entitled to recover $250 for each work day that the violation occurred, not to exceed $5,000.  See N.Y. Lab. Law § 198(1-d); see Baltierra, 2015 WL 5474093, at *10.

Employees who commenced their employment before the WTPA took effect may recover damages for wage statement violations occurring after its effective date.  See Gamero, 272 F. Supp. 3d at 510-11 (awarding damages for violations of NYLL § 195(3)'s wage notice requirement where plaintiffs' employment commenced before the effective date of the WTPA); see also Bonn-Wittingham v. Project O.H.R. (Office for Homecare Referral), Inc., No. 16 Civ. 541 (ARR) (JO), 2016 WL 7243541, at *8 (E.D.N.Y. Dec. 14, 2016) (finding the employee eligible for damages for wage statement violations where his employment began before the WTPA went into effect); Carter v. Tuttnaeur U.S.A. Co., 78 F. Supp. 3d 564, 570 (E.D.N.Y. 2015) (same).

It is undisputed that Defendants failed to provide Plaintiff with wage statements as required under the WTPA.  Tr. I 62:14-64:5-8; Tr. II 225:2-17.  Although Defendants raise the affirmative defense of timely and complete payment under § 198(1-d), as set forth above, they did not pay Plaintiff the minimum total compensation required in one pay period in August 2010, another in April 2014, and the majority of pay periods in 2015, thus that affirmative defense is unavailable to Defendants for these pay periods.  Plaintiff is therefore entitled to recover damages for these wage-statement violations.  See, e.g., Severino, 2015 WL 12559893, at *9 ("Employers may . . . be held liable for furnishing wage statements that fail to comply with all of the WTPA's enumerated requirements.").

## III.    DAMAGES

A party seeking damages "must prove the amount of damages by a preponderance of the evidence."  Solis v. SCA Rest. Corp., 938 F. Supp. 2d 380, 392 (E.D.N.Y. 2013); accord Reich

v. S. New Eng. Telcomms. Corp., 121 F.3d 58, 67 (2d Cir. 1997) ("[Plaintiff] must produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'") (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187 (1946))); Napoli v. 243 Glen Cove Ave. Grimaldi, Inc., No. 13 Civ. 5828 (JFB) (ETB), 2019 U.S. Dist. LEXIS 152345, at *21-22 (E.D.N.Y. Sept. 6, 2019) ("Finally, plaintiff must prove the amount of damages by a preponderance of the evidence").

### A. Unpaid Wages

To calculate damages for violations of overtime provisions of the NYLL and/or FLSA, the Court must compare what Plaintiff was entitled to be paid with what he was paid. As discussed above, Plaintiff was paid at least the proper minimum wage and overtime except in 2015 and in a few instances prior. In 2015, Plaintiff was entitled to a minimum wage of $638.75 for his usual 62-hour schedule. He was therefore entitled to the following additional wages based on his hours worked each week in 2015:[6]

---

[6] Although there were instances in which Plaintiff was paid more than the minimum wage demanded, these do not offset the total monies owed. See Harold Levinson Assocs. v. Chao, 37 F. App'x 19, 22 (2d Cir. 2002) ("We reject the defendants' argument that their purported 'overpayments' of overtime in certain weeks should offset their liability for other weeks."); Conzo v. City of N.Y., 667 F. Supp. 2d 279, 291 (S.D.N.Y. 2009) (collecting cases) (noting the Sixth and Seventh Circuits, as well as guidance from the Department of Labor, conclude "an employer may only credit extra payments against overtime liability accruing in the same workweek") (citations omitted); see also, e.g., Velez v. 111 Atlas Rest. Corp., No. 14 Civ. 6956 (MKB) (CLP), 2016 U.S. Dist. LEXIS 107230, at *34 (E.D.N.Y. Aug. 11, 2016) (noting "the employer may not simply decide not to pay minimum wage and overtime for all hours that were worked simply because the employer believes there were times when the employees were overpaid").

| Pl. 7 Bates No. | Time Period | Hrs Worked | Paid | Min Wage for Hrs Worked | Owed |
|---|---|---|---|---|---|
| D251 | 12/29/14-1/4/15 | 62 | $600.00 | $614.75 | **$14.75** |
| D252 | 1/5/15-1/11/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D252 | 1/12/15-1/18/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D253 | 1/19/15-1/25/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D254 | 1/26/15-2/1/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D255 | 2/2/15-2/8/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D256 | 2/9/15-2/15/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D257 | 2/16/15-2/22/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D258 | 2/16/15-2/22/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D259 | 2/23/15-3/1/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D260 | 3/2/15-3/8/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D261 | 3/9/15-3/15/15 | 61 | $600.00 | $625.63 | **$25.63** |
| D262 | 3/16/15-3/22/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D263 | 3/23/15-3/29/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D264 | 3/30/15-4/5/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D265 | 4/6/15-4/12/15 | 59 | $600.00 | $599.38 | **-$0.62** |
| D266 | 4/13/15-4/19/15 | 62 | $600.00 | $638.75 | **$38.75** |
| D267 | 4/20/15-4/26/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D268 | 4/27/15-5/3/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D269 | 5/4/15-5/10/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D270 | 5/11/15-5/17/15 | 52 | $630.00 | $498.75 | **-$131.25** |
| D271 | 5/18/15-5/24/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D272 | 5/25/15-5/31/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D273 | 6/1/15-6/7/15 | 60 | $630.00 | $625.63 | **-$4.38** |

| | | | | |
|---|---|---|---|---|
| D274 | 6/8/15-6/14/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D275 | 6/15/15-6/21/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D276 | 6/22/15-6/28/15 | 60 | $630.00 | $625.63 | **-$4.38** |
| D277 | 6/29/15-7/5/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D278 | 7/6/15-7/12/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D279 | 7/13/15-7/19/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D280 | 7/20/15-7/26/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D281 | 7/27/15-8/2/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D282 | 8/3/15-8/9/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D283 | 8/10/15-8/16/15 | 52 | $500.00 | $498.75 | **-$1.25** |
| D284 | 8/17/15-8/23/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D285 | 8/24/15-8/30/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D286 | 8/31/15-9/6/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D287 | 9/7/15-9/13/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D288 | 9/14/15-9/20/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D289 | 9/21/15-9/27/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D290 | 9/28/15-10/4/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D291 | 10/5/15-10/11/15 | 65.5 | $580.00 | $684.69 | **$104.69** |
| D292 | 10/12/15-10/18/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D293 | 10/19/15-10/25/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D294 | 10/26/15-11/1/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D295 | 11/2/15-11/8/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D296 | 11/9/15-11/15/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D297 | 11/16/15-11/22/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D298 | 11/23/15-11/29/15 | 62 | $630.00 | $638.75 | **$8.75** |

| | | | | | |
|---|---|---|---|---|---|
| D299 | 11/30/15-12/6/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D300 | 12/7/15-12/13/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D301 | 12/14/15-12/2015 | 62 | $630.00 | $638.75 | **$8.75** |
| D302 | 12/21/15-12/27/15 | 62 | $630.00 | $638.75 | **$8.75** |
| D303 | 12/28/15-12/29/15 | 20.5 | $180.00 | $179.38 | **-$0.63** |
| | | | | Total Owed: | **$897.57** |

In addition, as noted <u>supra</u>, there were two instances prior to 2015 in which Plaintiff was paid less than his due minimum wages. During the week of August 8, 2010, Plaintiff had not yet received any raises to his initial rate of compensation and worked 56 hours, but he was paid $452.33. Pl. 7 at D25. Based upon his negotiated hourly rates of $7.50 per regular hour and $11.25 per overtime hour, he should have received $480.00 (($7.50*40 = $300) + ($11.25 * 16 = $180)) and is therefore owed $27.67; moreover, his required payment under the minimum wage at the time, $7.25, would have been $464 (($7.25*40 = $290) + ($10.875 * 16 = $174). During the week of April 20, 2014, Plaintiff was compensated less than the minimum hourly ($8.00) and overtime ($12.00) wages as he was paid $500 for 59 hours of work, when he should have received $548.00 (($8.00 * 40 = $320) + ($12.00 * 19 = $228)). Pl. 7 at D216. He is therefore owed $48.00 for that week.

Accordingly, Plaintiff is entitled to a total of $973.24 ($897.57 + $48.00 + $27.67) in unpaid wages.

### B.    Spread-of-Hours Premium

As discussed above, an employee earning minimum wage is entitled to an extra hour's pay at that minimum-wage rate for any day for which "the spread of hours exceeds 10." 12 N.Y.C.R.R. § 146-1.6; <u>see</u> <u>Guerrero v. 79th St. Gourmet & Deli Inc.</u>, No. 18 Civ. 04761 (ARR)

(ST), 2019 U.S. Dist. LEXIS 155382, at *23 (E.D.N.Y. Sep. 10, 2019) ("[E]mployees who earn more than the minimum wage rate are generally not entitled to spread-of-hours pay . . . .") (citations omitted). The minimum wage rate was $8.75 per hour from December 31, 2014 through the end of Plaintiff's employment in December 2015. See Gamero, 272 F. Supp. 3d at 499. In 2015, Plaintiff worked more than 10 hours in a given shift on 54 occasions. See Pl. 7 at D252-D303. Of these occasions, 12 occurred during weeks in which Plaintiff was paid more than the minimum-wage rate, leaving 42 instances in which Plaintiff should have received spread-of-hours payments at the minimum hourly wage rate of $8.75 in 2015.

In addition, as noted above, there were two other weeks in which Plaintiff was not compensated at or above minimum wage. On August 3, 2010, Plaintiff worked 12 hours during a week in which his weekly salary that was less than the minimum wage for the hours worked. See Pl. 7 at D25. He is therefore owed one instance of spread-of-hours pay at the minimum wage at the time ($7.25). During the week of April 14, 2014, Plaintiff was paid less than the minimum wage rate that week, and he worked more than 10 hours per day for five days. Id. at D216. He is thus entitled to an additional five instances of spread-of-hours pay at the minimum wage at that time ($8.00). Accordingly, based on the above findings of fact, the Court concludes that in addition to the amounts described supra, Plaintiff is entitled to $414.75 ((42 * $8.75 = $367.50) + 7.25 + (5 * $8.00 = $40)) in unpaid spread-of-hours pay.

### C. Wage-statement Violations (NYLL § 195(3))

The NYLL entitles Plaintiff to recover statutory damages for violations of the wage-statement requirement of $250 per work day, not to exceed $5,000. N.Y. Lab. Law § 198(1-d), As discussed above, Defendants violated the wage statement requirement of the NYLL by failing to provide Plaintiff with complete and accurate wage statements for, inter alia, much of

2015.[7] See II(A)(3), supra.  Because Plaintiff worked for Defendants for more than 20 days

without receiving a proper wage statement, Plaintiff is entitled to $5,000, the statutory

maximum, in statutory damages for Defendants' violation of the wage-statement requirement.

### D.   Liquidated Damages

Under both the NYLL and the FLSA, an employee is entitled to recover liquidated

damages unless the employer can establish a good-faith basis for having failed to pay the

required wages.  See 29 U.S.C. § 260; N.Y. Lab. Law § 198(1-a); Fermin v. Las Delicias

Peruanas Rest., Inc., 93 F. Supp. 3d 19, 47 (E.D.N.Y. 2015). "[T]he employer bears the burden

of establishing, by plain and substantial evidence, subjective good faith and objective

reasonableness. The burden . . . is a difficult one to meet, however, and double damages are the

norm, single damages the exception." Solis, 938 F. Supp. 2d 380, 403 (E.D.N.Y. 2013) (internal

citations & quotation marks omitted).  "To establish 'good faith,' a defendant must produce

'plain and substantial evidence of at least an honest intention to ascertain what the Act requires

and to comply with it.'" Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 71 (2d Cir.

1997) (quoting Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987)); see Herman v. RSR Sec.

Servs., 172 F.3d 132, 142 (2d Cir. 1999) ("To establish good faith, the employer must take active

steps to ascertain the dictates of the [law] and then act to comply with them.").  In the event an

employer does not demonstrate good faith, an employee is entitled to recover liquidated damages

under NYLL up to 100% of the total unpaid wages for violations occurring after April 9,

2011.  See N.Y. Lab. Law §§ 198(1-a), 663(1) (effective Apr. 9, 2011); Gonzalez v. Masters

Health Food Serv. Inc., No. 14 Civ. 07603 (VEC), 2017 U.S. Dist. LEXIS 139174, 2017 WL

---

[7] Because Plaintiff's statutory damages have reached the $5,000 maximum allowed, the 2010 and
2014 underpayments are not relevant to this calculation.

3835960, at *18 (S.D.N.Y. July 27, 2017); Sun v. China 1221, Inc., No. 12 Civ. 7135 (RJS),

2016 U.S. Dist. LEXIS 52292, at *7-8 (S.D.N.Y. Apr. 19, 2016). As relevant here, for violations

occurring before April 9, 2011, employees can only recover 25% of the total unpaid wages in

liquidated damages. See Sun, 2016 U.S. Dist. LEXIS 52292 at *7-8 (citations omitted). For

purposes of calculating liquidated damages, unpaid wages includes unpaid spread-of-hours

pay. See Cazarez v. Atl. Farm & Food Inc., No. 15 Civ. 2666 (CBA) (RML), 2017 U.S. Dist.

LEXIS 76785 at *11 (E.D.N.Y. May 31, 2017), R&R adopted, No. 15 Civ. 2666 (CBA) (RML),

2017 U.S. Dist. LEXIS 137111 (E.D.N.Y. Aug. 25, 2017).

Here, Defendants have failed to establish a good-faith basis for having failed to pay either

the required wages or spread-of-hours payments. Although Mr. Singh testified that he would call

his accountant to find out if the minimum wage had increased, these contacts appear to have

been sporadic and inconsistent, and are thus insufficient to find good faith under the

FLSA/NYLL. Tr. II 225:18-226:7; see e.g., Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp.

2d 253, 316-17 (S.D.N.Y. 2011) (declining to find good faith where defendant "testified only

that he 'requested information on things that[he] was not aware of, such as minimum wage, if it

increased during the year, and that information was provided to [him].'") Although Defendants

argue that Plaintiff was paid for non-compensable time, and thus Plaintiff was (in effect)

compensated for the spread-of-hours, as discussed above, the Court finds that Plaintiff's weekly

salary was intended to compensate him for his breaks as well as actual hours worked. See,

II(A)(6), supra. Plaintiff is thus entitled to liquidated damages equaling 25% of the unpaid

wages from August 2010 and 100% of the total unpaid wages after April 9, 2011 – including

unpaid spread-of-hours pay – totaling $1,361.80 (2010 violations $34.92*0.25 = $8.73 + 2014

violations $88 + 2015 violations $1,265.07).

### E.     Pre-judgment Interest Under The NYLL

The NYLL permits the award of both liquidated damages and pre-judgment interest.  See .De La Cruz v. Trejo Liquors, Inc., No. 16 Civ. 4382 (VSB) (DF), 2019 U.S. Dist. LEXIS 155411, at *25 (S.D.N.Y. Sep. 10, 2019); Vasquez v. Lahori Kebab & Grill Corp., No. 18 Civ. 2117 (JS) (SIL), 2019 U.S. Dist. LEXIS 137572, at *24 (E.D.N.Y. Aug. 13, 2019).  This dual availability occurs because New York State views liquidated damages as punitive, and not compensatory, such that pre-judgment interest is not a duplicative damages award.  See N.Y. Lab. Law § 198(1-a) (McKinney 2008); Reilly v. Natwest Mkts. Grp., Inc., 181 F.3d 253, 265 (2d Cir. 1999); Janus v. Regalis Constr., Inc., No. 11 Civ. 5788 (ARR) (VVP), 2012 U.S. Dist. LEXIS 127008, 2012 WL 3878113, at *8-9 (E.D.N.Y. July 23, 2012), R&R adopted, No. 11 Civ. 5788 (ARR), 2012 U.S. Dist. LEXIS 127003, 2012 WL 3877963 (E.D.N.Y. Sept. 4, 2012) (explaining that liquidated damages under the NYLL are meant to "constitute a penalty" on an employer's willful withholding of wages due, whereas pre-judgment interest is meant "to compensate a plaintiff for the loss of use money"); Santillan v. Henao, 822 F. Supp. 2d 284, 297 (E.D.N.Y. 2011) (quoting Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 265 (2d Cir. 1999)).

The availability of both NYLL liquidated damages and pre-judgment interest "remains true even where liability is found not only under the NYLL but also under the FLSA."  Begum, 2015 U.S. Dist. LEXIS 5598, 2015 WL 223780, at *3 (citing Thomas v. iStar Fin., Inc., 652 F.3d 141, 150 n.7 (2d Cir. 2011)).  Prejudgment interest is calculated based on a plaintiff's actual damages, but not liquidated damages or violations of the wage-statement provisions.  See Gamero, 272 F. Supp. 3d at 515.  Interest is calculated at a statutory rate of nine percent per year. N.Y. C.P.L.R. § 5004.  It is calculated "from the earliest ascertainable date the cause of

action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where, as here, damages were "incurred at various times," courts typically use the "midpoint of the accrual of damages" method to calculate interest. See, e.g., Padilla v. Manlapaz, 643 F. Supp. 2d 302, 314 (E.D.N.Y. 2009); Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005); Liu v. Jen Chu Fashion Corp., No. 00 Civ. 4221 (RJH) (AJP), 2004 WL 33412, at *5 (S.D.N.Y. Jan. 7, 2004).

Here, although Plaintiff's relevant causes of action (unpaid wages and spread of hours) first accrued on or about August 9, 2010, the next instance of underpayment did not occur until on or about April 14, 2014. The third instance of underpayment was January 3, 2015 (see Pl. 7 at D251), and all remaining instances of underpayment occurred throughout 2015, until Plaintiff's termination on December 29, 2015. The Court will adopt a combination of the two approaches described above, using the reasonable intermediate date approach for the 2015 underpayments, and calculating the interest separately for the earlier two instances. The midpoint for the purposes of NYLL pre-judgment interest calculations on the 2015 underpayments is July 2, 2015. Accordingly, because nine percent of $1,265.07 is $113.86, and there are 365 days in a year, Plaintiff is entitled to recover $0.31 per day ($113.86/365) from July 2, 2015, until the date judgment is entered. The August 2010 underpayment totaled $34.92 for the spread-of-hours and unpaid wages, nine percent of which is $3.14. Plaintiff is therefore entitled to recover $0.01 ($3.14/365) per day from August 9, 2010, until the date judgment is entered. The April 2014 underpayment totaled $88. Nine percent of $88 is $7.92. Plaintiff is therefore entitled to recover $0.02 ($7.92/365) per day from April 14, 2014 until the date judgment is entered.

### F. Post-judgment Interest

Plaintiff is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961. <u>See</u> <u>Blue v. Finest Guard Servs., Inc.</u>, 09 Civ. 133 (ARR), 2010 U.S. Dist. LEXIS 73223, 2010 WL 2927398, at *13 (E.D.N.Y. June 24, 2010) (awarding post-judgment interest on an FLSA- and NYLL-based default judgment); <u>Pereira v. J. Sister Hair Care Prods., Inc.</u>, 08 Civ. 4537 (GBD) (RLE), 2010 U.S. Dist. LEXIS 53137, 2010 WL 2194808, at *4 (S.D.N.Y. Apr. 5, 2010), <u>R&R adopted</u>, 2010 U.S. Dist. LEXIS 53249, 2010 WL 2194807, at *4 (S.D.N.Y. June 1, 2010) (same). This amount is calculated from the date of the entry of the judgment, at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. <u>See</u> 28 U.S.C. § 1961. As per 28 U.S.C. §1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a).

Plaintiff is entitled to post-judgment interest under 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a); <u>see</u> <u>Fermin</u>, 93 F. Supp. 3d at 53 (finding post-judgment interest to be mandatory in an FLSA- and NYLL-based default judgment); <u>Duffy v. Oyster Bay Indus., Inc.</u>, No. 10 Civ. 3205 (ADS) (ETB), 2011 WL 2259798, at *3 (Mar. 29, 2011) ("The very language of 28 U.S.C. § 1961 ensures that an award of post-judgment interest is mandatory in any civil case where money damages are recovered."), <u>R & R adopted</u>, 2011 WL 2259749 (E.D.N.Y. June 2, 2011). Under the statute, post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as

published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

Plaintiff is entitled to statutory post-judgment interest on the money judgment, which should be calculated by the Clerk of Court from the date the Clerk of Court enters judgment in this action until the date of payment, using the federal rate set forth in 28 U.S.C. § 1961.

### G.     Attorneys' Fees and Costs

The FLSA and the NYLL both provide for recovery of attorney's fees and costs in the event of successful wage protection claims. <u>See</u> 29 U.S.C. § 216(b); N.Y. Lab. L. § 663(4). Here, Plaintiff filed a motion for the attorneys' fees and costs associated with the depositions of Mr. Moorjani and Mr. Arora (ECF No. 71, <u>generally</u>), but Plaintiff has not yet submitted evidence of the overall attorneys' fees and costs incurred with prosecuting this action generally. Accordingly, Plaintiff's limited application at ECF No. 71 is denied without prejudice and with leave to refile within 14 days a comprehensive motion for overall costs and fees in light of the Court's decision herein. Such application must take into account the limited degree of success obtained. The parties are encouraged to discuss settling the fee and costs issues.

IV.    **CONCLUSION**

In light of the foregoing, Defendants are ordered to pay Plaintiff a total damages award of

$7,749.79, which includes $973.24 in unpaid wages, $414.75 in unpaid spread-of-hours

premiums, $1,361.80 in liquidated damages, and $5,000 in statutory damages for violating the

wage statement provision of the NYLL, plus pre-judgment interest under the NYLL calculated at

$0.31 per day from July 2, 2015, $0.01 per day from August 9, 2010, and, $0.02 per day from

April 20, 2014, until the date judgment is entered.

Dated:  Brooklyn, New York
        September 30, 2019

_____
                        /S/
              VERA M. SCANLON
            United States Magistrate Judge